1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6

INGRID ANDERS,

7
                            Plaintiff,

8         v.

9   KENNETH J. BRAITHWAIT, Secretary of the
    Navy,

10
                            Defendants.

Case No. 3:19-cv-5433 BHS-TLF

REPORT AND
RECOMMENDATION

NOTED FOR OCTOBER 8, 2021

11

12        This matter comes before the Court on Defendant's motion for summary judgment

13  pursuant to Federal Rule of Civil Procedure ("FRCP") 56 (Dkt. 24). This matter has been

14  referred to the undersigned Magistrate Judge. *Mathews, Sec'y of H.E.W. v. Weber*, 423 U.S. 261

15  (1976); 28 U.S.C. § 636(b)(1)(B); Local Rule MJR 4(a)(4). For the reasons set forth below, the

16  Court should **GRANT** Defendant's motion for summary judgment.

17                     I.  PROCEDURAL AND FACTUAL BACKGROUND

18        On May 17, 2019, Plaintiff Ingrid Anders filed a complaint against the Navy asserting

19  claims for denial of reasonable accommodations, retaliation, and hostile work environment under

20  the Rehabilitation Act of 1973. Dkt. 1. During the relevant period, Anders was employed as a

21  civilian employee by the Department of the Navy, Naval Facilities Engineering Command

22  ("NAVFAC") as a contract specialist. Dkt. 1 at ¶ 3.1. Anders suffers from fibromyalgia. *Id.* at ¶

23  2.2. Anders initiated the Navy's reasonable accommodation process, seeking an accommodation

24  for her disability in 2012. *Id.* at ¶ 4.4-4.8. After engaging in the reasonable accommodation

25

process and conducting an ergonomic assessment of Anders' work area, Anders was provided with a rollerball mouse, a speech recognition software program called "Dragon", and an ergonomic keyboard and mouse. *Id.* at ¶ 4.8; Dkt. 25-1.

In November 2015, Anders' ergonomic mouse failed and needed to be repaired. Dkt. 1 at ¶ 4.17. Anders submitted a ticket with the Navy on November 16, 2015 to request that IT repair the mouse. The Navy's IT personnel attempted to resolve the issue over a course of two weeks, but were unable to. Dkt. 26 at ¶ 9-15. Anders alleges that Pamela Pratt ("Pratt"), Anders' supervisor, called her a "whiner" and would "dramatically roll her eyes" when Anders would express complaints. Dkt. 1 at 4.16.

On December 10, 2015, Pratt met with Jennifer Herbig, the acting reasonable accommodation coordinator, to discuss Anders' requests for a replacement mouse, for temporary telework pending replacement of the mouse, and measures that would be taken to alleviate the noise near Anders' cubicle to assist with the functionality of the Dragon software. Dkt. 1 at ¶ 4.22; Dkt. 26-3 ¶ 18. Anders alleges that although she was permitted to work remotely, Pratt would assign her "source sensitive" jobs that required her to come into the office. Dkt. 1 at ¶ 4.23; Dkt. 32-4.

Anders alleges in her complaint that the Navy took adverse employment actions against her by subjecting her to a hostile work environment, denying her a certification that she needed to apply for a different position, refusing to abide by reasonable accommodations upon which the Navy had agreed, and refusing to grant her request for part time work in August of 2016. Dkt. 1 at ¶ 6.3. Anders alleges that when she applied for a small business deputy position in 2015, Anders' second-line supervisor, Eileen Mitchell ("Mitchell"), refused to look at her application and thus, she was forced to apply on USAjobs.gov. Dkt. 25-1. Anders was subsequently advised

that she did not correctly complete her application because she did not receive a specific certification. *See id.* Anders alleged that several other promotions went through the office internally, but Mitchell purposefully did not look at Anders' application.

On February 11, 2021, the Navy filed a motion for summary judgment arguing that the Court should dismiss Anders' claims. Dkt. 24. On March 8, 2021, Anders responded. Dkt. 32. On March 18, 2021, the Navy replied. Dkt. 35.

First, the Navy contends that it did not deny Anders reasonable accommodations. The Navy alleges that in December of 2015, Anders was informed that the Computer/Electronics Accommodations Program was out of funds and funds would not be available to purchase a new ergonomic mouse until January of 2016. Dkt. 26-3 at ¶ 19. Mitchell purchased Anders a new mouse from her own funds. *Id.* The Navy contends (and Anders agrees) that it approved Anders' request for telework in December of 2015 pending the replacement of her mouse and until there was a way to alleviate the noise near Anders' cubicle. Dkt. 24 at 6.

The Navy argues that during the time that Anders was working remotely, she was told on multiple occasions not to work outside her medical limitations and her work could be reassigned if necessary. Dkt. 26-4; Dkt. 26-5. In January of 2016, Anders formally requested voice activated software, an ergonomic assessment, a dexterity available mouse and an equipment assessment. Dkt. 28 at ¶ 5. The Navy argues that over the following several months, it worked to provide Anders with her requested accommodations. Dkt. 24-8.

With respect to Anders' retaliation claim, the Navy contends that the Navy denied her request to work part time after the birth of her son due to high vacancy rates at the time and prior poor experiences with employees working part time. Dkt. 27 at ¶ 15. Further, the Navy disputes Anders' allegation that the Navy retaliated against her when she was told that she did not apply

1  for the small business deputy position correctly. Rather, the Navy argues that promotions do not

2  occur internally and would not have reviewed anyone's application, including Anders', to be fair

3  and equitable to all potential applications. Dkt. 27 at ¶ 25.

4  II.  DISCUSSION

5  A.  SUMMARY JUDGMENT STANDARD

6  Summary judgment is proper only if the pleadings, the discovery and disclosure materials

7  on file, and any affidavits show that there is no genuine issue as to any material fact and that the

8  movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is

9  entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient

10  showing on an essential element of a claim in the case on which the nonmoving party has the

11  burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of

12  fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for

13  the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

14  (1986) (nonmoving party must present specific, significant probative evidence, not simply "some

15  metaphysical doubt."). *See also* Fed. R. Civ. P. 56(d). Conversely, a genuine dispute over a

16  material fact exists if there is sufficient evidence supporting the claimed factual dispute,

17  requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby,*

18  *Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Service Inc. v. Pacific Electrical Contractors*

19  *Association*, 809 F.2d 626, 630 (9th Cir. 1987).

20  The determination of the existence of a material fact is often a close question. The court

21  must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

22  e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254, *T.W. Elect.*

23  *Service Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor

24  of the nonmoving party only when the facts specifically attested by that party contradict facts

25

specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elect. Service Inc.*, 809 F.2d at 630 (relying on *Anderson*, supra). Conclusory, non-specific statements in affidavits are not sufficient, and "missing facts" will not be "presumed." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89 (1990).

B.    REASONABLE ACCOMMODATION CLAIM

In a disability discrimination claim based on failure to accommodate, a plaintiff must prove: (1) that she has a disability under the applicable statute; (2) that the federal agency had notice of her disability; (3) that she requested an accommodation due to her disability; (4) that she was a qualified individual able to perform the essential functions of her job with or without reasonable accommodations; and (5) that there were specific reasonable accommodations that the federal agency refused to provide. *See* 29 U.S.C. § 701 et. seq.; *see also, e.g., Zivkovic v. S. California Edison Co.*, 302 F.3d 1080, 1088–89 (9th Cir. 2002).

The Navy does not dispute that Anders has a disability or that they had notice of it. Nor do they dispute that Anders requested an accommodation because of her disability or that she was qualified to perform the essential functions of her job with or without reasonable accommodation. Rather, the Navy disputes Anders' allegation that she was denied specific reasonable accommodations. Dkt. 24 at 5.

A "reasonable accommodation" may include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies,

the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(8).[1]

"Once an employer becomes aware of the need for accommodation, that employer has a mandatory obligation under the ADA to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations." *Humphrey v. Memorial Hosps. Ass'n,* 239 F.3d 1128, 1137 (9th Cir.2001). The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and neither side can delay or obstruct the process. *See id*. Moreover, the 9th Circuit has held that the duty to accommodate "is a 'continuing duty that is 'not exhausted by one effort.'"" *Id.* at 1138 (citing *McAlindin v. County of San Diego*, 192 F.3d 1226, 1237 (9th Cir. 1999).

The EEOC Enforcement Guidance notes that "an employer must consider each request for reasonable accommodation," and that "[i]f a reasonable accommodation turns out to be ineffective and the employee with a disability remains unable to perform an essential function, the employer must consider whether there would be an alternative reasonable accommodation that would not pose an undue hardship." EEOC Enforcement Guidance on Reasonable Accommodation, at 7625. Thus, the employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed. This rule fosters the framework of cooperative problem-solving contemplated by the ADA, by encouraging employers to seek to find

---

[1] "The standards used to determine whether an act of discrimination violated the Rehabilitation Act are the same standards applied under the Americans with Disabilities Act." *Coons v. Sec'y of the U.S. Dept. of Treasury,* 383 F.3d 879, 884 (9th Cir.2004).

accommodations that really work, and by avoiding the creation of a perverse incentive for employees to request the most drastic and burdensome accommodation possible out of fear that a lesser accommodation might be ineffective. *Humphrey*, 239 F.3d at 1128.

"[E]mployers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Barnett v. U.S. Air, Inc.,* 228 F.3d 1105, 1116 (9th Cir.2000) (en banc), *vacated on other grounds,* 535 U.S. 391 (2002).

Here, Anders alleges that the Navy failed to provide her with reasonable accommodations during the following periods: (1) November 16, 2015-December 8, 2015 (2) December 14, 2015-February 11, 2016, and (3) March 1, 2016-April 18, 2016. Dkt. 1 at ¶ 5.7-5.10. Anders argues that the intentional delays caused by supervisors Pratt and Mitchell are the reasons for this claim for denial of reasonable accommodation. In this case, the Navy ultimately provided the requested accommodations to Anders, and the only issue is whether the Navy unreasonably delayed the accommodation process.

Although unreasonable delay in providing an accommodation can provide evidence of discrimination, summary judgment is proper if the employer acted reasonably and in good faith. *See, e.g., Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (affirming summary judgment in favor of the employer, despite 20-month delay); *Clayborne v. Potter*, 448 F. Supp. 2d 185, 193 (D.D.C. 2006) (granting summary judgment for the employer, despite 12-month accommodation process). Courts have considered the following factors: "the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith." *Selenke v. Medical Imaging of Colorado,* 248 F.3d 1249, 1262-1263 (10th Cir. 2001).

Here, Anders alleges that in November of 2015, when her ergonomic equipment failed, the Navy denied her reasonable accommodations by failing to replace it until December 17, 2015. Dkt. 1 at ¶5.5. The record shows (and Anders acknowledges) that during this month, the Navy IT personnel attempted to fix Anders' mouse and Anders was permitted to telework until the mouse was fixed. Dkt. 32 at 3. Further, after Anders was notified that the Computer/Electronics Accommodations Program did not have the funds to replace her mouse until January of 2016, Mitchell purchased Anders a new mouse from her own personal funds. *Id.* at 4.

On December 8, 2015, Anders also requested additional accommodations to reduce the noise level in her cubical and assistance with the functionality of her Dragon voice recognition software. *Id.* at 3. Anders met with the Acting Reasonable Accommodations Coordinator to discuss her requests on December 10, 2015. *Id.* On December 14, 2015, the door next to Anders' cubicle was blocked to reduce noise levels at her workstation. Anders was also permitted to telework during this time. *Id.* While the Navy did not install or order higher walls, Anders was eventually moved to a new work location in February of 2016. Dkt. 32 at 8. With respect to Anders' argument that she was given "source sensitive" assignments while teleworking, Anders did not specify instances of when she was given "source sensitive" jobs or what those jobs entailed.

On January 15, 2016, Anders submitted a request for accommodation form and requested an updated version of the Dragon software, an ergonomic assessment, a dexterity available mouse and equipment assessment. Dkt. 28. On January 28, 2016, the updated version of the Dragon software was ordered. On February 28, 2016, the Navy created a purchase request for a mini-keyboard and pen mouse. On March 2, 2016, the Navy completed an ergonomic assessment

of Anders' new workstation, which led to the Navy ordering equipment between March 8 and April 21, 2016. In July of 2016, Anders requested permission to telework while the Navy installed the new version of Dragon on her computer at work. Within days, the Navy authorized Anders' request to telework for two days a week and more, if needed on an *ad hoc* basis. The Navy approved the updated version of the software on August 19, 2019; funding was secured by August 23, 2016, and on September 8, 2016, Anders confirmed that the new version of Dragon had been installed on her computer. *Id.*

Delay alone does not establish a violation of the Rehabilitation Act or raise a genuine issue of material fact precluding summary judgment. Here, there is no evidence tending to show that the Navy acted unreasonably or failed to act in good faith throughout the interactive process. *See, e.g., Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000) (affirming summary judgment in favor of the employer, despite 20-month delay in implementing requested accommodation, and holding that employer acted reasonably and in good faith by keeping plaintiff on medical leave and considering him weekly for an open position). In this case, the Navy continued to engage in the interactive process to accommodate Anders' disability, and the process simply took more time than Anders was expecting.

The time between each of Anders' requests and the consideration or implementation of the accommodation was minimal in comparison to other cases in which courts, including this one, still granted summary judgment. *See, e.g., Frick v. Local 23 of the Int'l Longshore & Warehouse Union,* No. C12-2224 TSZ, 2014 U.S. Dist. LEXIS 34631, *17 (W.D. Wash. Mar. 14, 2014) (granting summary judgment in favor of employer despite 72-day delay since employer engaged in the interactive process, continued following up, and approved plaintiffs' accommodation requests); *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000)

(affirming summary judgment in favor of the employer, despite 20-month delay in implementing requested accommodation, and holding that employer acted reasonably and in good faith by keeping plaintiff on medical leave and considering him weekly for an open position); *Clayborne v. Potter*, 448 F. Supp. 2d 185, 193 (D.D.C. 2006) (granting summary judgment for the employer, despite 12-month accommodation process).The Court concludes that the record, taken as a whole, could not lead a rational trier of fact to find for Anders, and summary judgment is warranted.

C.    RETALIATION

Retaliation claims under the Rehabilitation Act are subject to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802– 04 (1973). Under that framework, an employee challenging an adverse employment action has the initial burden of establishing a prima facie case of retaliation. *Id.* The burden then shifts to the employer to provide a legitimate, nonretaliatory reason for the adverse employment action. *Id*. If the employer does so, then the burden shifts back to the employee to prove that the reason given by the employer was pretextual. *Id*. To make a *prima facie* showing of retaliation, a plaintiff must show: "(1) involvement in a protected activity, (2) an adverse employment action and (3) a causal link between the two." *Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir. 2003). To establish a causal link, "[t]he plaintiff must present 'evidence adequate to create an inference that an employment decision was *based on* an illegal discriminatory criterion." *Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U. S. 308, 312, (1996)) (emphasis in original).

In her opposition, Anders alleges that supervisor Pratt retaliated against her for pursuing her requests for reasonable accommodations by rolling her eyes at Anders and calling her names, and assigning Anders in-office work when she was supposed to be teleworking. Further, Anders

argues that Mitchell retaliated against her by refusing to grant Anders' request to work part time in August of 2016. Dkt. 32 at 16-17.

The EEOC has interpreted "adverse employment action" to mean "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." EEOC Compliance Manual Section 8, "Retaliation," ¶ 8008 (1998). Although EEOC Guidelines are not binding on the courts, they "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 65 (1986) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)).

The EEOC test covers lateral transfers, unfavorable job references, and changes in work schedules. These actions are all reasonably likely to deter employees from engaging in protected activity. Nonetheless, it does not cover every offensive utterance by co-workers, because offensive statements by co-workers do not reasonably deter employees from engaging in protected activity. *Ray v. Henderson,* 217 F.3d 1243, 1245 (9th Cir.2000).The verbal taunting and instances of eye-rolling constitute offensive behavior but do not rise to the level of an adverse employment action. *See Manatt v. Bank of America, N.A.,* 339 F.3d 792, 798–99 (9th Cir.2003).

With respect to Anders' allegation that her supervisors retaliated against her by assigning her source sensitive jobs, there is no genuine dispute of material fact regarding whether this was an adverse employment action. Anders does not identify specific instances of when she was assigned non-remote-working jobs or what those jobs entailed that prevented her from teleworking. Rather, the record shows -- and plaintiff has not presented evidence to counter --

that supervisor Pratt communicated directly with Anders to address concerns Anders had with any assignment while teleworking. Dkt. 27.

Anders also argues that the Navy retaliated against her when it denied her request to work part time after the birth of her son in November of 2016 even though two employees were permitted to do so in the past. The Navy however, provided a legitimate, nonretaliatory reason for denying Anders' request. The record shows that at the time Anders made this request, the Navy was experiencing high vacancy rates and had problems in the past making part-time schedules work.  Dkt. 27, Dkt. 30. The two employees who were permitted to work part time prior to Anders had been in contact with the former Chief Contracting Officer -- who had since been replaced. Dkt. 30. Further, while Anders' request was not initially granted, the Navy eventually permitted Anders to work parttime. She maintains that schedule to date. Dkt. 30.

With respect to Anders' allegation that she was retaliated against when she was denied the small business deputy position, the Navy met its initial burden of demonstrating that there is not a genuine dispute regarding this particular fact. Mitchell acknowledges that she would not have reviewed Anders' application, or anybody's application, because she would not want to give any applicant an unfair advantage. Dkt. 27 at ¶ 25. Anders, by failing to address this particular fact in her response brief, has not shown that there is a genuine dispute as to this fact.

Thus, Anders has failed to provide sufficient evidence of pretext on any of these claims. Accordingly, the Navy's motion for summary judgment on Anders' retaliation claim should be GRANTED.

D.    HOSTILE WORK ENVIRONMENT

Anders acknowledges that the Ninth Circuit has not explicitly ruled on the availability of a hostile work environment claim based on disability.[2] *See Brown v. City of Tucson*, 336 F.3d 1181, 1190 (9th Cir. 2003). The Fourth, Fifth, and Eighth Circuits have recognized hostile working environment claims under the ADA. *See Fox v. General Motors Corp.*, 247 F.3d 169, 175 (4th Cir.2001); *Flowers v. Southern Reg'l Physician Servs., Inc.*, 247 F.3d 229, 233 (5th Cir. 2001); *Shaver v. Independent Stave Co.*, 350 F.3d 716, 719-20 (8th Cir. 2003). These courts have held that in order to succeed on a claim of disability-based harassment under the ADA, Plaintiff must prove that: (1) she belongs to a protected group; (2) she was subjected to unwelcomed harassment; (3) the harassment complained of was based on her disability or disabilities; (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and to create an abusive working environment; and (5) the employer knew or should have known of harassment and failed to take prompt, remedial action. *Flowers*, 247 F.3d at 235-36.

Plaintiff argues that the harassment consisted of supervisors, Pratt and Mitchell, refusing to cooperate with the Navy's efforts to accommodate her, Pratt rolling her eyes at her and calling Anders a "whiner", and Mitchell and Pratt requiring her to provide "mitigation" plans every time she requested time off, which was not requested of any other employee. Anders argues that although she reported her harassment complaints to Ms. Kirkpatrick in early 2015, nothing was done to remediate her concerns until a year later.

In reviewing Plaintiff's claims, the Court considers Title VII case law to determine whether harassment occurred. *See Hernandez v. Hughes Missile Sys. Co.*, 362 F.3d 564, 568 (9th

---

[2] The Ninth Circuit has assumed, without deciding, that a hostile work environment claim exists under the ADA. *See Garity v. APWU National Labor Organization*, 655 F. App'x 523, 524 (9th Cir. 2016).

1    Cir. 2004) (drawing on Title VII precedent to set out plaintiff's burden in an ADA case). In doing

2    so, the Court must look at "all the circumstances," including "the frequency of the discriminatory

3    conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

4    utterance; and whether it unreasonably interferes with an employee's work performance" to

5    determine whether an actionable hostile work environment claim exists. *Nat'l R. R. Passenger*

6    *Corp. v. Morgan*, 536 U.S. 101, 116 (2002). The Supreme Court has held that "[w]hen the

7    workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is

8    'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

9    abusive working environment,' Title VII is violated." *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21

10   (1993).

11           The Court concludes that Anders has not established a hostile work environment claim

12   based on her disability. Pratt's conduct of rolling her eyes at Anders and calling her a "whiner",

13   in addition to Pratt and Mitchell asking Anders to prepare mitigation plans do not constitute

14   harassment either taken separately or considered as a whole, nor do they fit the criteria of a

15   hostile work environment. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80

16   (1998) (recognizing that Title VII is not a general civility code for the workplace and does not

17   prohibit all employment-related verbal or physical harassment); *see also Brooks v. City of San*

18   *Mateo*, 229 F.3d 917, 927 (9th Cir.2000) ("[N]ot all workplace conduct that may be described as

19   harassment affects a terms, condition, or privilege of employment within the meaning of Title

20   VII.").

21           Instances in which courts *have* found an actionable hostile work environment claim

22   involve conduct significantly more severe and/or pervasive than the conduct alleged here. *See,*

23   *e.g. Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (finding a hostile work

24

25

environment where a male employee was called a "f. . .t" and a "f. . .g female whore" by co-workers and supervisors at least once a week and often several times per day); *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807-09 (7th Cir. 2000) (finding an actionable hostile work environment claim where plaintiff's supervisor grabbed her face and stuck his tongue down her throat on one occasion, unfastened her brassiere on another, and told her during a third that encounter he could perform oral sex on her so effectively that she would do cartwheels).

Anders also describes her interactions with Kirkpatrick in early 2015 as another contributing factor to her hostile work environment claim. However, Anders' EEO complaint makes no mention of Kirkpatrick or their discussions in February and April of 2015. Rather, the EEO complaint focused on conduct starting in November of 2015. The scope of a civil action alleging employment discrimination is limited by the charge filed with the EEOC. *See Albano v. Schering-Plough Corp.,* 912 F.2d 384, 386 (9th Cir.1990). Because Anders' EEOC complaint did not include specific claims relating to Kirkpatrick, the Court will not consider such claims in its hostile work environment analysis. Dkt. 25-2.

Thus, the Navy's motion for summary judgment on Anders' hostile work environment should be granted.

### III.  CONCLUSION

Based on the foregoing, the undersigned recommends that the Court **GRANT** defendant's motion for summary judgment (Dkt. 24) and dismiss plaintiff's claims with prejudice.

The parties have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. 28 U.S.C. § 636(b)(1); FRCP 6; FRCP 72(b)(2). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985). If objections are filed, the parties shall have **fourteen (14) days** from the

service of the objections to file a response. FRCP 72(b)(2). Accommodating this time limitation, this matter shall be set for consideration on **October 8, 2021**, as noted in the caption.

Dated this 20th day of September, 2021.

Theresa L. Fricke
United States Magistrate Judge